CERTIFIED COPY

A True Copy
Teste:



Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 08-1583 & 08-2493

DANIEL B. WATERS,

*Plaintiff-Appellee,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 4762—**Milton I. Shadur**, *Judge.*

ARGUED FEBRUARY 27, 2009—DECIDED SEPTEMBER 2, 2009

Before MANION, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Daniel B. Waters worked as a painter for the City of Chicago (City) from 1994 until his termination in 2000. In 2002, he sued the City and four of his superiors in their individual and official capacities under 42 U.S.C. § 1983, alleging retaliation in violation of his First Amendment rights. This appeal requires us to decide whether the district court erred in denying the City's motion for judgment as a matter of law and

whether it erred in awarding Waters attorneys' fees and costs. We conclude that the district court should have granted the motion for judgment as a matter of law, and we reverse its judgments.

## I. Background

Daniel Waters was employed as a painter with the City's Department of Transportation (CDOT), Bureau of Bridges from July 1994 until August 2000. (He previously had worked for the City as a painter from 1990 to 1991.) In 1994 Waters' general foreman, Kirk Woelfe, asked him to campaign in the Tenth Ward. Waters did so. Then in early 2000, he was again asked to campaign. This time he refused. Waters alleged that his refusal constituted an exercise of his free speech and freedom of association rights protected by the First Amendment.

Waters also alleged that he exercised his freedom of speech and association rights by contacting the media on two occasions while employed with CDOT. First, in 1998 or 1999, he contacted Walter Jacobson from the local Fox TV station about a bridge Waters believed was in disrepair and a danger to the public. Waters took a reporter and photographer to the bridge to look at the workmanship. Afterwards Stan-Lee Kaderbek, the deputy commissioner of CDOT's Bureau of Bridges, and Mark Fornaciari, general foreman, general trades under Kaderbek, came to the job site after midnight. According to Waters, it was very unusual for them to be at the job site. They confronted Waters. Kaderbek looked him straight in the eye and said, "Hi Dan," in a very pro-

nounced manner. After this occurrence Waters noticed changes in his job—he was given assignments far away from home, his working conditions were poor, and he was subjected to verbal abuse and what he perceived as efforts to provoke him.

Waters contacted the media a second time in late March 2000 when he contacted John Kass from the Chicago Tribune. Waters believed the City was doing expensive improvements to the property where its iron shop was located to benefit the company that owned the property. He took Kass to the iron shop and showed him around. Art Korzniewski, an assistant to Kaderbek, observed Waters doing so. Later that day Dean Maltes, acting foreman, told Waters, "Boy, you are in trouble now." And Michael Clatch, one of five foremen for the painters, testified that after Kass's visit to the iron shop, Woelfe told him, "Dan's in trouble now." Clatch also testified that nothing happened in the Bureau of Bridges without Kaderbek's input.

At that time, Waters had been assigned to the iron shop approximately one and one-half to two years. However, just a few days after Kass's visit and after Waters had refused to campaign in the Tenth Ward, Waters was transferred out of the iron shop. He was transferred to the Springfield Pumping Station where Anthony Tripoli, acting foreman, became his supervisor. Waters had worked with Tripoli six times before. Waters described their working relationship as unpleasant. He claimed that Tripoli tried to provoke him, said mean things to him, and gave him difficult jobs. Waters explained that

Tripoli knew that Waters had pain in his knees and gave him assignments where he would have to paint on his knees.

One of Waters' coworkers testified that within a week of Kass's visit, he heard Fornaciari tell a general foreman, "We're going to fire that crybaby son of a bitch." However, Waters' name was not mentioned. Clatch testified that Tripoli told him that Kaderbek had promised to make Tripoli a permanent foreman if Tripoli got rid of Waters. This didn't pan out for Tripoli. He never became a permanent foreman. In fact, after Waters' termination, Tripoli's "acting foreman" title was taken away from him.

On April 5, 2000, only days after Waters' reassignment to the pumping station, Waters and Tripoli were involved in an incident. Waters confronted Tripoli and three other painters who were in the break room, even though the official break time was over. He questioned why they were still there and whether the break rules applied to him only. There was some yelling and, at one point, Waters dropped onto a bench. Because of his size, he pushed up against Jimmy Stratton, one of the other painters there. As a result of this incident, Tripoli filed a violence in the workplace incident report against Waters, claiming that he used direct or indirect verbal threats, physical abuse or the use of force, and threatening, intimidating, coercive behavior. The three other painters' versions of what happened seemed to corroborate Tripoli's account. Waters claimed that he did not touch or verbally intimidate anyone during the argument.

A pre-disciplinary hearing was set for May 15, 2000. Waters didn't attend—he called in sick that day because he wasn't feeling well and his wife was having labor contractions and wanted to go to the hospital. The hearing was rescheduled for May 17. It was not uncommon for an employee to avoid a pre-disciplinary hearing; such hearings were regularly rescheduled due to an employee's absence.

However, on the morning of the 15th, Waters telephoned Tripoli to ask him if he had a criminal record. Waters had heard from other painters that Tripoli had a record. Waters wanted to confirm if Tripoli did in an effort to bolster his own credibility as compared to Tripoli's regarding the April 5 incident. The afternoon of the 15th while on his way to the hospital, Waters stopped at the pumping station to obtain Tripoli's license plate number to give to a private investigator and to encourage one of the witnesses of the April 5 incident to "back off his charges or at least tell the truth." Waters talked with some coworkers outside the door of the pumping station, but didn't go in. However, Tripoli came to the door, yelled at Waters, and told him to leave. Someone called the police. When they arrived, Waters was detained for a brief period. He was not arrested and no charges were filed against him.

As a result of the morning call and the afternoon incident, Tripoli made two more violence in the workplace incident reports against Waters. Tripoli claimed that the phone call was threatening. He alleged that Waters made threatening remarks in the parking lot to Tripoli and

Stratton (who had been involved in the April 5 incident). Tripoli also alleged that Waters was intimidating because of his size. Stratton likewise reported that Waters had been intimidating and threatening.

Kaderbek had had enough of Waters. Later that day, on May 15, Kaderbek wrote a memorandum to Cheri Heramb, CDOT's deputy commissioner of personnel, and Florence Hooker, director of administration. The memo requested that charges be drafted to show cause for Waters' termination based on a continuing pattern of verbal and physical threats. Kaderbek copied the memo to CDOT Commissioner Judith Rice. Kaderbek was responsible for discipline within the Bureau of Bridges but did not have the authority to terminate an employee. He could only recommend termination; Commissioner Rice had the authority to terminate.

Donald O'Malley, the CDOT violence in the workplace liaison between the CDOT and the Department of Personnel, emailed Kaderbek that it was premature to request that charges be drafted regarding the May 15 incidents. Indeed, it was contrary to the City's disciplinary procedures. O'Malley advised Kaderbek that they needed to contact Waters and have him fill out an attachment to the incident reports or interview him to get his account of the May 15 events.

Waters completed an attachment to both May 15 incident reports, providing his account of what had happened. Waters said that his telephone call was non-threatening and that he was simply inquiring whether Tripoli had a criminal background. Regarding the events

in the parking lot, Waters claimed that Tripoli and Stratton had threatened him and that Tripoli prevented him from leaving the parking lot. Waters also claimed that Tripoli had intimidated and threatened to get him fired. Waters denied that he had ever threatened Tripoli.

O'Malley reviewed the reports and attachments completed by the participants and witnesses and, on June 5, 2000, he completed his own report on the two May 15 incidents.[1] His responsibility was to determine whether the allegations in the incident report and attachments, if believed, fell within the definition of violence in the workplace. O'Malley concluded that in both incidents Waters was attempting to intimidate Tripoli and other participants. O'Malley also found that on May 15 Waters was attempting to retaliate against Tripoli for filing the April 5 incident report. O'Malley submitted his report to Kaderbek.

On June 23, 2000, Kaderbek issued a memorandum similar to his May 15 memo, again requesting that charges be drafted showing cause for Waters' termination.

The procedures for addressing termination recommendations apparently were followed in Waters' case. The City's

---

[1] O'Malley also reviewed the incident report and attachments for the April 5 break room incident and completed a report dated May 3, 2000. He concluded that the incident involved a verbal and physical confrontation in which Waters made direct and indirect threats to the other painters and Tripoli and that Waters bumped into Stratton in an intimidating manner. O'Malley submitted this report to Kaderbek as well.

Law Department drafted a statement of charges based on the reports without conducting any further investigation, the Commissioner signed off on them, the charges were given to Waters, he responded in writing, and a hearing was scheduled to transmit the statement of charges and explain the appeal process. Waters did not attend this predisciplinary hearing because he was away visiting family. Commissioner Rice made the decision to terminate Waters. Waters appealed to the City's Personnel Board which held a hearing at which Waters and others testified. The Board denied his appeal.

Waters sued the City of Chicago, Kaderbek, Fornaciari, Tripoli, and another employee under § 1983, alleging retaliation against him for exercising his First Amendment rights. He also asserted a state law intentional infliction of emotional distress claim. By agreement of the parties the individual defendants were dismissed. The City moved for summary judgment, arguing in part that Waters had no evidence to establish municipal liability. In particular, the City contended that the decisionmakers were not final policymakers. The district court granted summary judgment on the state law claim and denied it on the § 1983 claim before the City had an opportunity to file a reply. The district court subsequently allowed the City to file a reply and, nonetheless, reaffirmed its denial of summary judgment as to the claim under § 1983. The court concluded that Kaderbek's retaliatory motive would have poisoned the final decision to terminate Waters and that the City could be held liable even if the ultimate decisionmaker was "pure as driven snow."

The case was tried to a jury. At the close of Waters' case, the City moved for judgment as a matter of law under Fed. R. Civ. P. 50 based, in part, on the lack of evidence establishing municipal liability. The district court deferred ruling and allowed the case to go to the jury. The jury found in favor of Waters and awarded him compensatory damages of $225,000. The district court denied the City's Rule 50 motion and entered judgment for Waters in accordance with the jury's verdict. Thereafter, the City renewed its motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) and, in the alternative, for a new trial under Fed. R. Civ. P. 59. The motions were denied. Following a bench trial on equitable relief, the district court awarded Waters back pay, front pay and lost pension benefits, totaling more than $1 million. Final judgment was entered and the City appealed. The court subsequently awarded Waters attorneys' fees and costs under § 1988. The City appealed that decision as well. We consolidated the two appeals.

## II. Analysis

The City appeals the denial of its Rule 50 motion for judgment as a matter of law, contending that Waters presented insufficient evidence to establish that the City may be held liable under § 1983. We review de novo the district court's denial of the City's motion. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006). In doing so, we view the evidence presented in the light most favorable to Waters and draw all reasonable infer-

ences in his favor. *Id*. We will reverse only if no rea-
sonable juror could have found in favor of Waters. *See id.*

We conclude that the district court erred in denying the
City's motion for judgment as a matter of law because
Waters presented no evidence that a final policymaker
caused his alleged constitutional deprivation. The
evidence at trial established that Commissioner Rice
was the final decisionmaker for purposes of terminating
CDOT employees and that she made the decision to
terminate Waters' employment. However, she was not a
final policymaker for the City with respect to employ-
ment policy. Nor did the evidence support a finding
that Rice harbored any discriminatory animus toward
Waters.

A municipality may be held liable for a constitutional
deprivation under *Monell v. Dep't of Social Servs.*, 436 U.S.
658 (1978). To establish municipal liability under § 1983,
however, a plaintiff must present sufficient evidence
to show that the constitutional violation resulted from a
municipal policy, custom, or practice. *Monell*, 436 U.S.
at 694. This requirement "distinguish[es] acts of the
*municipality* from acts of *employees* of the municipality,
and thereby make[s] clear that municipal liability is
limited to action for which the municipality is actually
responsible." *Estate of Sims ex rel. Sims v. County of Bureau*,
506 F.3d 509, 515 (7th Cir. 2007) (quoting *Pembaur v. City
of Cincinnati*, 475 U.S. 469, 479 (1986)) (emphasis in *Estate
of Sims*). "Misbehaving employees are responsible
for their own conduct; units of local government are
responsible only for their policies rather than miscon-
duct by their workers." *Id.* (quotations omitted).

A plaintiff may establish municipal liability by showing "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* Waters did not offer any evidence of an express policy or a widespread practice at trial and does not attempt to establish the City's liability under either of those avenues on appeal. Therefore, to establish municipal liability, he was required to present evidence that his constitutional injury was caused by an individual with final policymaking authority with respect to the subject matter in question. *See Valentino v. Vill. of S. Chi. Heights*, No. 06-3882, 2009 WL 2253406, at *7 (7th Cir. July 30, 2009); *Campion, Barrow & Assocs. v. City of Springfield, Ill.*, 559 F.3d 765, 769 (7th Cir. 2009).

## A.  Final Policymaker

Waters asserts that the City is subject to § 1983 liability because Commissioner Rice had final policymaking authority for the City for employment matters. State or local law determines whether a person has policymaking authority for purposes of § 1983. *Campion, Barrow & Assocs.*, 559 F.3d at 769. The Chicago City Council is the City's legislative body with the authority to adopt rules regarding employment policy. The City Council has delegated the authority to promulgate personnel rules to the Commissioner of Human Resources. Chi., Ill. Municipal

Code § 2-74-050. As a result, both the City Council and Commissioner of Human Resources may be considered final policymakers for the City in the area of employment. The Commissioner of Human Resources did exercise his authority and promulgated the City's Personnel Rules. Waters does not dispute any of these points. Instead, he asserts that the Personnel Rules delegate rule making authority over employment matters to department heads.

An executive official may have policymaking authority by express delegation. *See Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir. 1992). In asserting that the Personnel Rules delegated policymaking authority to department heads, Waters points to one subsection in the rules, namely Rule XXI—Personnel Administration—Relationship to City Departments, Section 1—Responsibility of Heads of Departments for Personnel Administration. That section states: "The principal responsibilities of each department head for personnel administration include: . . . (b) The development and administration of departmental work rules." Thus, Waters equates "departmental work rules" with "personnel rules." He makes this leap by relying on another Personnel Rule, Rule XVIIIA, which concerns disciplinary actions for non-career service employees. That rule states that in dealing with non-career service employees, supervisors may utilize the "work rules" applicable to career service employees set forth in Section 1 of Rule XVIII as guidelines.

Rule XVIII, which immediately precedes Rule XVIIIA in the Personnel Rules, is entitled, "Disciplinary Actions

and Procedures for Career Service Employees." (Waters was a career service employee.) Rule XVIII identifies 55 different types of conduct that may result in disciplinary action against a career service employee. Included in this lengthy list is "[a]ny act of violence in the workplace or violation of the City's Violence in the Workplace Policy"—the very rule violation upon which Waters' termination was based. Rule XVIII also sets forth the different types of disciplinary actions that may be imposed as well as hearing and progressive disciplinary procedures to be followed. Section 5 of the rule establishes the procedure to be followed in the case of termination, demotion, or suspension over thirty days.

We are not persuaded that "departmental work rules" as used in Section 1 of Rule XXI has the same meaning as "personnel rules." The City's Personnel Rules is a sixty-three page document which governs both career and non-career service employees. The Rules address a multitude of personnel matters, including position classifications, compensation, leaves of absences, performance evaluations, a drug and alcohol testing policy, personnel records, and sick leave, just to name a few. Thus, the Personnel Rules cover a comprehensive array of personnel and employment matters for the City. In contrast, Waters relies on a snippet within this comprehensive set of rules. That subsection expressly governs "personnel *administration*," not personnel or employment policy. As we have said before: "The authority . . . to *set* policy—i.e., to adopt rules for the conduct of government—distinguishes a 'final policymaker,' whose decisions may subject a municipality to § 1983 liability,

from an official who merely possesses 'authority to *implement* pre-existing rules.'" *Argyropoulos v. City of Alton*, 539 F.3d 734, 740 (7th Cir. 2008) (citations omitted) (emphasis in *Argyropoulos*). Rule XXI, Section 1's title and text indicate that it grants department heads the authority to implement the existing personnel policy; the rule does not grant department heads the authority to set personnel policy for the City. That policy is already embodied in the Personnel Rules themselves.

The other provisions in Section 1 of Rule XXI support this view. In addition to departmental work rules, the provisions address a department head's responsibility for administration of, inter alia, evaluation of the performance of employees, development and implementation of training programs, and maintaining personnel records. These are all areas specifically covered by other Personnel Rules. *See* Rule XIV—Performance Evaluations; Rule XV—Training and Career Development; Rule XXII—Personnel Records. Similarly, department heads are given the responsibility to initiate personnel actions for employees, including disciplinary actions. Rule XXI, Section 1(c). As stated, disciplinary actions and applicable procedures are explicitly covered in Rules XVIII and XVIIIA. Rule XXI simply makes department heads responsible for administering the policies embodied in those rules. In particular, the Rules cover the subject of an employee's termination and the procedures to be followed in the case of termination.

"When an official's discretionary decisions are constrained by policies not of that official's making, those

policies . . . are the act of the municipality." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). A reading of the Personnel Rules reveals that a department head's authority and responsibility to initiate disciplinary action against an employee is constrained by Rule XVIII. That rule embodies the policy for the types of conduct for which disciplinary action should be taken, subject to the department head's discretion to apply the policy in a given case. *See* Personnel Rule XVIII, Section 1 ("The following conduct . . . will result in disciplinary action which may include discharge unless the employer, taking all circumstances into account, deems it to be excusable."). Similarly, "when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies." *Praprotnik*, 485 U.S. at 127. Rule XVIII explicitly states that a decision to discharge a career service employee is "subject to appeal to the Personnel Board" and that "[n]o permanent employee in the Career Service may be discharged . . . unless the statement of charges and any matters in support are first reviewed by the Departments of Law and Personnel." Personnel Rule XVIII, Section 5. The Personnel Rules therefore establish that the termination decision is subject to review by the Law and Personnel Departments. The Commissioner of Human Resources did not delegate the authority to develop employment policy to department heads.

While Commissioner Rice had the authority to make the final decision whether to terminate Waters' employment, her decision was constrained by the Personnel Rules.

Her decision also was subject to review by the
Personnel Board and the Law and Personnel Depart-
ments for compliance with City personnel and employ-
ment policies. Therefore, Commissioner Rice did not
have final authority to make employment policy for
the City.

And there is another reason why we cannot accept
Waters' argument that the Commissioner of Human
Resources delegated policymaking authority to depart-
ment heads. We agree with the City that had the Com-
missioner of Human Resources intended to delegate the
authority to set personnel policy to the department heads,
the Commissioner would have been explicit about it. The
setting of personnel policy for any municipality is a
highly important matter. This is especially true for a
city the size of Chicago, which employs thousands of
individuals. It escapes reason to believe that the Com-
missioner would have delegated matters of such impor-
tance in such an indistinct manner, and there is no evi-
dence in the record to suggest that the Commissioner
delegated that authority.

In conclusion, Waters had to present evidence from
which a reasonable juror could find that Commissioner
Rice was the final policymaker with respect to the City's
employment policy. However, his evidence came up
short: He presented no evidence of the delegation to
Rice of final policymaking authority in employment
matters. Therefore, the City's motion for judgment as a
matter of law should have been granted.

## B. Retaliatory Motive

But even if Waters had presented evidence to establish that Commissioner Rice was a final policymaker with respect to employment policy, the City's Rule 50 motion should have been granted. Waters also failed to present any evidence to prove that Rice terminated him in retaliation for his exercise of his First Amendment rights.

Waters contends that a municipality can be held liable if a municipal policymaker intentionally performs an act that results in a constitutional violation without regard to the policymaker's intent. This is incorrect. It is not enough for a plaintiff simply to show an intentional act by a policymaker that results in a constitutional deprivation. A § 1983 plaintiff must prove culpability, i.e., that the policymaker intentionally deprived him of a constitutional right. In *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997), the Court confirmed that where a plaintiff attempts to hold a municipality liable under § 1983 for a single decision attributable to the municipality, he must prove fault and causation:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. . . . [A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Id.* at 404. As in any § 1983 action, the plaintiff must "establish the state of mind required to prove the underlying violation." *Id.* at 405. A municipality can be held

liable under § 1983 only if culpable; it cannot be held liable under respondeat superior. *Id.* at 403; *see also Valentino*, 2009 WL 2253406, at *7 ("*Monell* liability is not a form of respondeat superior.").

In a First Amendment retaliation claim, as Waters alleged here, the plaintiff must prove that his speech "was the 'reason' that the employer decided to act." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009); *see also Fairley v. Andrews*, No. 07-3343, 2009 WL 2525564, at *7 (7th Cir. Aug. 20, 2009) (indicating that the decisions which say that a plaintiff need only prove that his speech was *a* motivating factor in the defendant's decision do not survive *Gross*). Waters presented no evidence to establish that Commissioner Rice's decision to terminate his employment was caused whatsoever by his exercise of his free speech or association rights. Nor did he produce any evidence to suggest that Rice even knew about his exercise of those rights. The most that can be said of Waters' proof is that he established that Kaderbek and perhaps others under him harbored a retaliatory motive. Such evidence may show that these supervisors are responsible for their own misconduct, but falls short of establishing the City's liability under *Monell*. *See Estate of Sims*, 506 F.3d at 515 ("Misbehaving employees are responsible for their own conduct; units of local government are responsible only for their policies rather than misconduct by their workers." (quotation omitted)).

Waters suggests that the City can be held liable because Rice adopted Kaderbek's recommendation that

Waters be terminated and Kaderbek had a retaliatory motive. True, a municipality may be held liable based on a ratification theory. *Killinger v. Johnson*, 389 F.3d 765, 772 (7th Cir. 2004); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001) (stating that "by adopting an employee's action as its own (what is called 'ratification'), a public employer becomes the author of the action for purposes of liability under section 1983"). However, it is not enough for the policymaker to merely approve another's decision. In *Praprotnik* the Court stated: "If the authorized policymakers approve a subordinate's decision *and the basis for it*, their ratification would be chargeable to the municipality[.]" 485 U.S. at 127 (emphasis added). Waters argues that the *Praprotnik* Court did not address the significance of "the basis for it" language because in that case no policymaker reviewed the decision at issue. We do not presume that this language lacked significance, however.

We have reiterated that for municipal liability to attach, a municipality must approve both the employee's conduct and the basis for that conduct, i.e., the employee's motivation. *See, e.g., Rasche v. Vill. of Beecher*, 336 F.3d 588, 598 n.11 (7th Cir. 2003) ("In order to adopt such an action, the municipality must know of the 'subordinate's conduct' and 'approve[ ] of the conduct *and the basis for it*.'" (quoting *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998)) (emphasis added); *Killinger*, 389 F.3d at 772. Similarly, other circuits have required proof that the policymaker approved of the unconstitutional motive. *See, e.g., Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440, 451 (4th Cir. 2004); *Brennan v. Norton*, 350 F.3d 399, 427-28

(3d Cir. 2003) (no municipal liability where plaintiff offered no evidence that mayor or town council approved of retaliatory motivation behind township manager's retaliatory actions).

As an example, in *Kirby*, the plaintiff police officer gave testimony at another officer's grievance hearing that the plaintiff believed angered the police chief. The plaintiff was subsequently reprimanded and the chief later demoted him. The plaintiff claimed he was retaliated against for exercising his freedom of speech. *Kirby*, 388 F.3d at 443-44. During the grievance process, the plaintiff's demotion was affirmed by the City's personnel appeals committee and city manager. *Id.* at 444-45. The plaintiff sued the City under § 1983, asserting that it could be held liable for retaliating against him because it ratified and acquiesced in the chief's decision to demote him. The court rejected that theory because the plaintiff had no evidence that the appeals committee or city manager approved of retaliation as a basis for his demotion. *Id.* at 451.

The Supreme Court's discussion of delegation in *Praprotnik* has some bearing on this issue as well. The Court stated that "[s]imply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the polices that are supposed to guide them." *Praprotnik*, 485 U.S. at 130. The Court further explained that "the mere failure to investigate the basis of a subordinate's discre-

tionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale." *Id.* This rationale applies equally to a ratification theory. If the mere approval by a policymaker of a subordinate's decision was sufficient to impose municipal liability, then virtually any action by a municipal employee could become chargeable to the municipality, and the municipality would be liable under respondeat superior liability. But we know that it can't be. *See Valentino*, 2009 WL 2253406, at *7 ("*Monell* liability is not a form of respondeat superior."). Waters would have us read the "and the basis for it" language right out of *Praprotnik*. We decline to do so.

While Commissioner Rice accepted Kaderbek's recommendation and terminated Waters, Waters presented no evidence that she approved of Kaderbek's retaliatory motivation. Waters offered no evidence that Rice acted with the intent to deprive him of his First Amendment rights. Nor did he offer any evidence that she was even aware of Kaderbek's retaliatory motive or that of anyone else. Nor did Waters present any evidence that Rice even knew that he declined to campaign in the Tenth Ward or that he contacted the media to report problems he perceived in the Bureau. Likewise, Waters offered no evidence to even suggest that the Commissioner of Human Resources, the City Council, or for that matter, the Personnel Board, affirmatively approved of any retaliatory motive behind the recommendation to terminate him. Thus, he has not shown municipal liability

under a ratification theory. In the end, Waters seeks to hold the City vicariously liable for the acts of its non-policymaking employees—Kaderbek and perhaps others subordinate to him. The law does not allow for municipal liability under § 1983 in such a case. *See Estate of Sims*, 506 F.3d at 515 ("[M]unicipal liability is limited to action for which the municipality is actually responsible" (quotation omitted)).

A brief comment on some of Waters' other arguments is warranted. Waters suggests that the City cannot avoid liability for injuries caused by a policymaker's act by claiming it did not know the act was illegal, relying on *Owen v. City of Independence, Mo.*, 445 U.S. 622 (1980). However, the City is not claiming that it did not know that firing an employee in retaliation for exercising his First Amendment rights was unlawful. Instead, its position is that his termination by Commissioner Rice simply did not violate his constitutional rights.[2]

---

[2] Waters makes a passing reference to the "cat's paw" theory, but we question whether such a theory is applicable for purposes of establishing § 1983 municipal liability. Under this theory, "the discriminatory animus of a nondecisionmaker is imputed to the decisionmaker where the former has singular influence over the latter and uses that influence to cause the adverse employment action." *Staub v. Proctor Hosp.*, 560 F.3d 647, 651 (7th Cir. 2009) (alleged discriminatory discharge under Uniformed Services Employment and Reemployment Rights Act). The theory is steeped in agency principles which are applied in the Title VII context, *see, e.g., Burlington Indus.*,

(continued...)

Finally, Waters feebly attempts to argue that "Rice could not have been blind to the illegal purposes of Stan Kaderbek" and that "the political realities of the relationship between the leadership of the City of Chicago and John Kass cannot be ignored." Yet Waters fails to cite any evidence to support these conclusory assertions. Speculation about Rice's knowledge of her subordinate's motivations and her awareness of the goings-on in the Bureau of Bridges does not get Waters to a jury.

---

2 (...continued)
*Inc. v. Ellerth*, 524 U.S. 742, 754 (1988) ("Congress has directed federal courts to interpret Title VII based on agency principles"), but don't apply to § 1983 municipal liability, *Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor" (emphasis in *Monell*)). We were unable to find any other case applying the cat's paw theory to hold a municipality liable under § 1983. The district court cited only Title VII and ADEA cases to justify its use of this theory and, in his defense of this theory in his appellate brief, Waters could only muster up a Title VII case. Imputing a non-decisionmaker's motive to a municipal employer sounds a lot like respondeat superior liability. Given that well developed § 1983 municipal liability law recognizes delegation and ratification, there seems to be little point in trying to awkwardly fit the cat's paw concept in this area of civil rights law. But even if a cat's paw type of theory applies in this context, Waters hasn't shown a singular influence over Rice that caused the termination decision. Furthermore, any minimal influence is negated by Rice's own independent review of the grounds for Waters' termination. *See Staub*, 560 F.3d at 656; *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 918-19 (7th Cir. 2007).

In sum, even if Commissioner Rice were a policymaker for employment matters for the City, the City was entitled to judgment as a matter of law because there was no evidence that she had a culpable motive or intent. Because we have decided that the City is entitled to a judgment as a matter of law, we need not address the district court's denial of the City's alternative motion for a new trial. Given that judgment will be entered for the City, Waters cannot be viewed as a prevailing party for purposes of 42 U.S.C. § 1988. Consequently, the district court's judgment awarding attorneys' fees and costs to Waters must also be vacated.

### III.

Accordingly, we VACATE the district court's judgments, REVERSE the district court's denial of the City's motions for judgment as a matter of law, and REMAND with directions to enter judgment as a matter of law in favor of the City and against Waters on Waters' claim arising under 42 U.S.C. § 1983.